UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STONE KEY PARTNERS LLC and STONE KEY SECURITIES LLC,<br><br>    Plaintiffs,<br><br>  - against -<br><br>MONSTER WORLDWIDE, INC.,<br><br>    Defendant. | Index No. 1:17-cv-03851-JMF-KNF<br><br>**AMENDED COMPLAINT** |

Plaintiffs, Stone Key Partners LLC and Stone Key Securities LLC (collectively "Stone Key"), by and through their attorneys, for their amended complaint against defendant Monster Worldwide, Inc. ("Monster" or the "Company"), hereby alleges upon personal knowledge as to themselves and as to their own conduct and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Stone Key brings this action to enforce its rights under an engagement letter dated April 20, 2012 (the "Engagement Letter") pursuant to which Stone Key rendered advisory services to Monster, and to collect fees of $8,890,596.00 and expenses of $47,339.01 that are due and owing as a result of those services and various transactions that Monster has consummated.

**I.   THE PARTIES**

2. Stone Key Partners LLC is a Delaware limited liability company wholly owned by the Delaware limited liability company Stone Key Group LLC. Stone Key Group LLC is a limited liability company whose members are Michael Urfirer, Chairman and Chief Executive

Officer of Stone Key Group LLC, and the Delaware limited liability company SKG Holdings LLC.  SKG Holdings LLC is a limited liability company whose members are Michael Urfirer and Doni Fordyce Urfirer, President and Chief Operating Officer of Stone Key Group LLC.  Michael Urfirer and Doni Fordyce Urfirer are citizens of the State of Connecticut.

3. Stone Key Securities LLC is a Delaware limited liability company wholly owned by the Delaware limited liability company Stone Key Group LLC.  Stone Key Group LLC is a limited liability company whose members are Michael Urfirer, Chairman and Chief Executive Officer of Stone Key Group LLC, and the Delaware limited liability company SKG Holdings LLC.  SKG Holdings LLC is a limited liability company whose members are Michael Urfirer and Doni Fordyce Urfirer, President and Chief Operating Officer of Stone Key Group LLC.  Michael Urfirer and Doni Fordyce Urfirer are citizens of the State of Connecticut.

4. Upon information and belief, Monster is a corporation organized under the laws of the State of Delaware with its principal place of business in Weston, Massachusetts.  Monster maintains a presence in more than 50 countries around the world, including offices at 622 Third Avenue, New York, New York 10017.

## II. JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiffs and defendant are citizens of different states and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

6. Venue is proper under 28 U.S.C §§ 1391(b)(1), (b)(2), and the agreed-upon forum-selection clause in the underlying Engagement Letter pursuant to which Monster agreed that all claims arising out of the Engagement Letter may be heard and determined in this Court.

7. Monster is subject to personal jurisdiction in this Court because it is authorized to do business within the district, has offices within the district, regularly transacts business within the district, and the asserted causes of action arise from Monster's contacts with the district, and because it has consented to personal jurisdiction in this Court with respect to the claims asserted in this action.

### III. FACTUAL BACKGROUND

#### A. MONSTER RETAINS STONE KEY AS FINANCIAL ADVISOR

8. Monster describes itself as "a global online employment solution for people seeking jobs and the employers who need great people." As of early 2012, and notwithstanding Monster's size and market position, its stock market performance had been languishing.

9. In or about February 2012, Stone Key and Bank of America Merrill Lynch ("BAML") began working with Monster as co-financial advisors in connection with a review of various strategic options, with the objective of maximizing shareholder value. Monster, BAML and Stone Key referred to that project as "Project Marlin."

10. Between February and April 2012, Monster and Stone Key negotiated the formal terms of the engagement, which was memorialized in the Engagement Letter dated April 20, 2012. A true and correct copy of the Engagement Letter is attached hereto as Exhibit A. Pursuant to the Engagement Letter, Monster engaged Stone Key to serve as Monster's financial advisor in connection with "a review of strategic alternatives, including the possible sale of the Company or the sale of an equity interest in the Company (as more fully described below, the 'Transaction') to any potential acquiror[.]" Engagement Letter, ¶ 1.

11. The Engagement Letter specified three types of transactions for which Stone Key would be entitled to compensation, two of which are relevant here: (i) a "Sale Transaction" and

(ii) a "Partial Sale Transaction." (The other type of transaction was a "Private Placement," which did not occur.)

12. A "Sale Transaction" was defined as a transaction in which "all or substantially all of the assets of the Company and its subsidiaries as a whole are transferred[.]" Engagement Letter, ¶ 3(a). Upon the signing of a definitive agreement with respect to a Sale Transaction, Stone Key was entitled to a Milestone Fee of $1,925,000. Engagement Letter ¶ 4(a). Upon closing of a Sale Transaction, Stone Key would receive additional fees calculated based on the total consideration paid by the acquiror, less the Milestone Fee. Engagement Letter, ¶ 4(b).

13. A "Partial Sale Transaction" includes any transaction "involving the sale of a material portion of the assets or operations of the Company and its subsidiaries taken as a whole that does not constitute a Sale Transaction[.]" Engagement Letter, ¶ 3(c). In the event of a Partial Sale Transaction, Monster agreed to "pay Stone Key a fee in an amount equal to 55% of the fee that shall be mutually acceptable to the Company and Stone Key and consistent with compensation agreements customarily agreed to by nationally recognized investment banking firms for transactions of similar size and complexity where are two co-financial advisors . . . ." Engagement Letter, ¶ 4(d).

14. On information and belief, Monster's co-advisor, BAML, entered into a similar agreement pursuant to which it would be paid 45% of the total fees that would be customarily paid for a Partial Sale Transaction.

15. Further, Monster agreed to "promptly reimburse Stone Key, periodically upon request, for all out-of-pocket expenses reasonably incurred, invoiced and documented, by Stone Key" up to $50,000 or, higher than $50,000 with Monster's approval, which approval shall not be unreasonably withheld or delayed. Engagement Letter, ¶ 5.

16. Each party had the right to terminate the Engagement Letter for any reason, or no reason, only "upon <u>written notice</u> thereof to the other party." Engagement Letter, ¶ 6 (emphasis added). Neither party has provided such written notice to the other.

17. If Monster had elected to terminate the Engagement Letter pursuant to its terms, which it did not, Stone Key nonetheless would "continue to be entitled to the full amount of any compensation payable pursuant to section 4" if a Sale Transaction or Partial Sale Transaction occurs with a party "with whom Stone Key or the Company had substantive discussions with respect to a Sale Transaction [or] Partial Sale Transaction . . . during the term of Stone Key's engagement hereunder" or with a party "identified on the list of prospective Acquirors . . . during the term of Stone Key's engagement" where the sale "(A) is consummated prior to the expiration of 12 months after any termination of Stone Key's engagement hereunder or (B) is entered into during such 12-month period and is subsequently consummated." *Id.*

    **B.**    **S<span>TONE</span> K<span>EY'S</span> P<span>ERFORMANCE</span> U<span>NDER THE</span> E<span>NGAGEMENT</span> L<span>ETTER</span> A<span>ND</span> M<span>ONSTER'S SALE OF ASSETS AND, EVENTUALLY, THE</span> C<span>OMPANY</span>**

18. As requested by Monster, Stone Key, working alone and in conjunction with BAML, provided a variety of advisory services to Monster. Those services included, but were not limited to: (i) a review and analysis of the business, financial condition and prospects of the Company; (ii) monitoring the Company's stock market activity; (iii) a review and analysis of Monster's potential strategic alternatives including, the sale of its Asian assets, a private placement financing, the sale of the Company to a financial buyer or to a strategic buyer; (iv) the preparation of marketing materials concerning the Company for the distribution and presentation to prospective interested parties; (v) the review and analysis of third parties who potentially could have been interested in a transaction with Monster; (vi) the preparation and implementation of the marketing plan; (vii) the management of the due diligence process with

interested parties; (viii) the solicitation of proposals from prospective interested parties; (ix) the review of proposals received from potential interested parties; (x) the review and analysis of the structure and terms of proposals received from potential interested parties from a financial point of view; and (xi) assistance in the negotiation of a potential transaction.

19. As of August 2013, proposals by potential acquirors for the sale of the Company were below what Monster had hoped to realize. Rather than accept a lower price, Monster decided to suspend active conversations relative to the sale of the entire Company while it undertook near-term steps to raise its stock price, including, but not limited to, a stock repurchase program.

20. Monster indicated on its August 1, 2013 analyst/investor earnings call that "active conversations" at that point had ended and that Monster had restarted its stock buy-back program. On the same call, Monster Chairman, President and Chief Executive Officer Salvatore Iannuzzi emphasized that: "With regard [to] the future and I want to be clear; Monster is a public company. If anyone has interest, we'll obviously listen. If we feel it's in the best interest of shareholders to increase shareholder value, we are prepared at any point in time to engage in conversations." On information and belief, a principal purpose of the stock repurchase program at that time was to enhance Monster's stock price in the near term in the hope that this would precipitate the prompt sale of the Company at an acceptable price.

21. Even as Monster suspended active conversations relative to the sale of the entire Company, it continued to explore other strategic transactions to improve its shareholder value, including efforts to sell some or all of its Asian business including the most valuable part of that business, its Korean operations known as "JobKorea."

99061977

22. On information and belief, as of July 2013, Monster had entered into discussions to sell a significant portion of JobKorea to H&Q Korea. Those discussions continued even as Monster suspended active conversations related to the sale of the entire Company.

23. In early November 2013, Monster publicly announced the sale of a 49.99% interest in JobKorea to H&Q Korea for an aggregate sale price of $90 million. Monster indicated on its November 7, 2013 analyst/investor earnings call that the JobKorea business was approximately $50 million of revenues and had EBITDA (earnings before interest, taxes, depreciation and amortization) of approximately $20 million.

24. JobKorea was one of Monster's most profitable businesses and, according to Sal Iannuzzi, Monster's CEO, the $90 million sale price constituted a material portion of the Company's total value representing "18%, 19% of the market cap of Monster today…"Monster's CEO, when asked if the sale of the 49.99% interest in JobKorea related to the strategic review process, responded that "…some of the thinking on this [the sale of the JobKorea stake] did come out of [the] strategic review."

25. On December 19, 2013, Monster publicly announced the completion of a sale of 49.99% of the interest in JobKorea to H&Q Korea.

26. The sale of the 49.99% interest in JobKorea constituted a "Partial Sale Agreement" under the Engagement Letter. On information and belief, in connection with that transaction Monster paid BAML a fee, pursuant to an invoice referencing "Project Marlin," in the amount of $2,500,000. Monster did not pay Stone Key a fee in connection with that transaction.

27. Thereafter, and continuing into 2014, Monster and Stone Key continued to discuss strategic initiatives. At all times from the beginning of the engagement through

99061977

completion of the Randstad transaction described below, Stone Key was and remained available for advice as requested by Monster pursuant to the terms of the Engagement Letter and has been ready, able and willing to perform.

28.    In October 2015, Monster announced the sale of the remaining 50.01% interest in JobKorea to H&Q Korea for $85 million.  That sale also constituted a Partial Sale Transaction.  Monster did not pay Stone Key a fee in connection with that transaction.

29.    On August 9, 2016, Randstad Holding NV ("Randstad") announced the execution of a definitive agreement under which Randstad would acquire Monster for a total purchase price of $429 million.  Randstad is a company that had been identified by Stone Key and BAML as a potential acquiror as early as April 2012.

30.    Randstad's acquisition of Monster, which constituted a Sale Transaction under the terms of the Engagement Letter, closed on November 1, 2016.

      **C.**      **STONE KEY IS ENTITLED TO RECEIVE ITS FEES AND EXPENSES UNDER THE ENGAGEMENT LETTER**

31.    Upon Monster's entry into a definitive agreement with Randstad, Stone Key became entitled to a Milestone Fee in the amount of $1,925,000.  Upon closing of the transaction, Stone Key became entitled to an additional fee of $1,697,286.94, for a total Transaction Fee of $3,622,286.94.

32.    As a result of the Partial Sale Transaction of Monster's 49.99% interest in JobKorea in December 2013, Stone Key became entitled to a fee pursuant to Section 4(d) of the Engagement Letter, in an amount equal to 55% of the fee that shall be mutually acceptable to the Company and Stone Key and consistent with compensation agreements customarily agreed to by nationally recognized investment banking firms for transactions of similar size and complexity where there are two co-financial advisors.  The fee paid to BAML in connection with that

transaction, $2,500,000, provides a direct benchmark for determining the appropriate fee due to Stone Key. Since BAML was to receive 45% of the fees and Stone Key 55% of the fees related to any Partial Sale Transaction, Stone Key's fee can be calculated by a simple extrapolation from BAML's fee. Stone Key's fee with respect to this transaction should be $3,055,555 (55% /45% times $2,500,000).

33. Stone Key also is entitled to a fee as a result of the Partial Sale Transaction of Monster's 50.01% interest in Job Korea in October 2015. Applying the same calculations as to the sale of the earlier interest, the Stone Key Fee should be $2,885,666 ($85 million of sale proceeds for the 50.01% Partial Sale/$90 million of sale proceeds for the 49.99% Partial Sale times $3,055,555).

34. In addition, pursuant to the Engagement Letter Stone Key is entitled to reimbursement of expenses in the amount of $47,339.01, which expenses were invoiced on February 13, 2017.

### D. MONSTER REFUSES TO COMPENSATE STONE KEY IN BREACH OF THE ENGAGEMENT LETTER

35. Promptly after the announcement of Monster's execution of a definitive agreement with Randstad, on August 21, 2016, Stone Key delivered to Monster invoices for the Milestone Fee then due and payable, and for the balance of the transaction fee which would and did become due and payable upon closing of the transaction. Thereafter, Stone Key also communicated with Monster regarding the fees due and payable for the JobKorea transactions.

36. Despite Stone Key's demands, Monster has refused to make any payments on account of the Sale Transaction with Randstad or the two Partial Sale Transactions related to JobKorea, taking the position that the Engagement Letter was orally terminated (notwithstanding the contractual language that any termination must be in writing) based on Monster's public

-9-

statements in August 2013 and that Stone Key is not entitled to any compensation for its services under the Engagement Letter in connection with any of the transactions.

37. Monster also has refused, without justification, to reimburse Stone Key for its expenses incurred in connection with the engagement without additional back-up, notwithstanding that Stone Key provided information similar to that relied on in prior dealings between the parties and in accordance with industry practice.

### FIRST CAUSE OF ACTION
**(For Breach of Contract related to the Sale Transaction with Randstad)**

38. Plaintiff realleges and incorporates herein by reference paragraphs 1 through [_].

39. The Engagement Letter is a valid and binding contract between Monster and Stone Key, and remains in full force and effect.

40. Stone Key has complied with all of its obligations pursuant to the Engagement Letter.

41. Pursuant to ¶ 4(a) and 4(b) of the Engagement Letter, Monster is obligated to pay Stone Key $3,622,286.94 for the Sale Transaction with Randstad.

42. In spite of receiving a demand for payment, Monster has failed to remit the outstanding payment to Stone Key.

43. Monster has materially breached its obligations under ¶ 4(a) and 4(b) of the Engagement Letter by refusing to pay Stone Key for its contract performance.

44. As a result of Monster's breach of the Engagement Letter, Stone Key has been damaged in the amount of $3,622,286.94 exclusive of interest.

### SECOND CAUSE OF ACTION
**(For Breach of Contract related to the 49.99% JobKorea Partial Sale Transaction)**

45. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 44.

99061977

46. Pursuant to ¶ 4(c) of the Engagement Letter, Monster is obligated to pay to Stone Key for the December 2013 Partial Sale Transaction with H&Q Korea for 49.99% of Monster's interest in JobKorea "55% of the fee that shall be mutually acceptable to the Company and Stone Key and consistent with compensation agreements customarily agreed to by nationally recognized investment banking firms for transactions of similar size and complexity where are two co-financial advisors."

47. The presumptive appropriate fee for that transaction is $3,055,555.

48. In spite of receiving a demand for payment, Monster has failed to remit the outstanding payment to Stone Key.

49. Monster has materially breached its obligations under ¶ 4(c) of the Engagement Letter by refusing to pay Stone Key for its contract performance.

50. As a result of Monster's breach of the Engagement Letter, Stone Key has been damaged in the amount of $3,055,555, exclusive of interest.

### THIRD CAUSE OF ACTION
**(For Breach of Contract related to the 50.01% JobKorea Partial Sale Transaction)**

51. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 50.

52. Pursuant to ¶ 4(c) of the Engagement Letter, Monster is obligated to pay to Stone Key for the October 2015 Partial Sale Transaction with H&Q Korea for Monster's remaining 50.01% in JobKorea "55% of the fee that shall be mutually acceptable to the Company and Stone Key and consistent with compensation agreements customarily agreed to by nationally recognized investment banking firms for transactions of similar size and complexity where are two co-financial advisors."

53. The presumptive appropriate fee for that transaction is $2,885,666.

99061977

54. In spite of receiving a demand for payment, Monster has failed to remit the outstanding payment to Stone Key.

55. Monster has materially breached its obligations under ¶ 4(c) of the Engagement Letter by refusing to pay Stone Key for its contract performance.

56. As a result of Monster's breach of the Engagement Letter, Stone Key has been damaged in an amount of $2,885,666, exclusive of interest.

## FOURTH CAUSE OF ACTION
### (For Breach of Contract related to the Non-Payment of Out-of-Pocket Expenses)

57. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 56.

58. Pursuant to ¶ 5 of the Engagement Letter, Monster is obligated to pay Stone Key for all reasonably incurred out-of-pocket expenses invoiced to Monster up to $50,000.

59. Stone Key submitted an invoice for $47,339.01 of out-of-pocket expenses.

60. In spite of receiving a demand for payment, Monster has failed to remit the outstanding payment to Stone Key.

61. Monster has materially breached its obligations under ¶ 5 of the Engagement Letter by refusing to pay Stone Key for its contract performance.

62. As a result of Monster's breach of the Engagement Letter, Stone Key has been damaged in the amount of $47,339.01, exclusive of interest.

## FIFTH CAUSE OF ACTION
### (For Quantum Meruit/Unjust Enrichment)

63. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 62.

64. Stone Key rendered professional services to Monster for benefit of Monster and incurred costs on behalf of Monster.

65. Monster retained the benefit of those services.

99061977

66. Stone Key reasonably expected to be compensated by Monster for the services rendered.

67. Stone Key is entitled to recover from Monster the fair and reasonable value of the services rendered.

68. Despite receiving demands from Stone Key, Monster has refused to pay for the reasonable value of the services rendered.

69. Monster has been unjustly enriched at Stone Key's expense.

**PRAYER FOR RELIEF**

WHEREFORE, Stone Key respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

1. A declaration that the Randstad sale constituted a Sale Transaction under the Engagement Letter and that Stone Key is entitled to a fee as calculated pursuant to ¶ 4(a) and (b) of the Engagement Letter.

2. Compensatory damages in the amount of $3,622,286.94 against Monster for its failure to pay Stone Key the fee due in connection with the Randstad Sale Transaction, plus prejudgment interest;

3. A declaration that the 49.99% JobKorea transaction and the 50.01% JobKorea transaction constituted Partial Sale Transactions under the Engagement Letter and that Stone Key is entitled for each transaction to a fee consistent with compensation agreements customarily agreed to by nationally recognized investment banking firms for transactions of similar size and complexity where are two co-financial advisors;

99061977

4. Compensatory damages in the amount of $3,055,555 against Monster for its failure to pay Stone Key the fee due in connection with the 49.99% JobKorea Partial Sale Transaction, plus prejudgment interest;

5. Compensatory damages in the amount of $2,885,666 against Monster for its failure to pay Stone Key the fee due in connection with the 50.01% JobKorea Partial Sale Transaction, plus prejudgment interest;

6. Compensatory damages in the amount of $47,339.01 against Monster for its failure to pay Stone Key reimbursement of its out-of-pocket expenses as provided in the Engagement Letter, plus prejudgment interest; and

7. Such other relief as the Court may deem just and proper.

Dated: New York, New York  
January 23, 2018

Respectfully submitted,

By /s/ Thomas D. Goldberg  
Thomas D. Goldberg (TG 7251)  
William F. Schmedlin (WS 0328)  
Howard Fetner (HF 1971)  
DAY PITNEY LLP  
7 Times Square  
New York, NY 10036  
(212) 297-5800  
(212) 916-2940 (fax)  
tgoldberg@daypitney.com  
wschmedlin@daypitney.com  
hfetner@daypitney.com  

*Attorneys for Plaintiffs Stone Key Partners LLC and Stone Key Securities LLC*

99061977