USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _08/10/2018___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :

STONE KEY PARTNERS LLC et al.,           :

                             :

             Plaintiffs,         :            17-CV-3851 (JMF)

                             :

          -v-                 :        OPINION AND ORDER

                             :

MONSTER WORLDWIDE, INC.,         :

                             :

             Defendant.      :

                             :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiffs Stone Key Partners LLC and Stone Key Securities LLC (together, "Stone Key") are, together, a boutique investment banking firm. Pursuant to an Engagement Letter dated April 20, 2012 (the "Engagement Letter"), Stone Key was retained by Defendant Monster Worldwide, Inc. ("Monster" or the "Company") to assist in "a review of strategic alternatives, including the possible sale of the Company or the sale of an equity interest in the Company." (PX-28 ("Engagement Letter"), § 1). Monster agreed to pay Stone Key compensation in the event that the Company entered into certain qualifying transactions. In this suit, Stone Key alleges that Monster breached its agreement to make those payments. In particular, Stone Key alleges that it is owed $8,890,596.00 in fees for three different transactions: the 2013 sale of 49.99% of Monster's interest in JobKorea ("JobKorea I"); the 2015 sale of Monster's remaining interest in JobKorea ("JobKorea II"); and the 2016 sale of the whole Company (the "Randstad Transaction"). Stone Key also seeks reimbursement for $47,339.01 in expenses.

      The Court held a three-day bench trial from June 25 to 27, 2018, with direct testimony taken from most witnesses by affidavit. As trial and oral argument made clear, whether Monster

breached its obligation to pay Stone Key fees pursuant to the Engagement Letter turns largely on whether the contract was completed before any of the transactions at issue took place. For the reasons that follow, the Court finds that Stone Key failed to prove, by a preponderance of the evidence, that the Engagement Letter remained open after August 1, 2013. It follows that Stone Key is clearly barred by the terms of the parties' contract from recovering fees for JobKorea II and the Randstad Transaction. JobKorea I, however, poses a closer question because the transaction occurred within a one-year tail period established by the Engagement Letter. The Court finds, however, that Stone Key cannot claim a fee for JobKorea I either, for two independent reasons: first, because the transaction did not qualify as a "Partial Sale Transaction" within the meaning of the Engagement Letter; and second, because the applicable provision of the Engagement Letter is an invalid and unenforceable agreement to agree. The Court does conclude, however, that Monster owes Stone Key $37,267.50, plus 9% prejudgment interest, for out-of-pocket expenses incurred under the Engagement Letter.

## FACTUAL FINDINGS

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact based on the testimony and exhibits at trial.[1] The Court sets forth certain additional findings of fact in the context of its legal analysis below.

### A. The Engagement Letter

Stone Key is a small investment banking firm that was founded in 2008 by Michael Urfirer and Denis Bovin, who worked at Bear Stearns until its collapse. (Urfirer Aff. ¶ 8;

---

[1] The Court ruled on many of the parties' objections to testimony and exhibits at trial and reserved judgment on others. To the extent that there was an unresolved objection to testimony or evidence that is relevant to the Court's analysis, the Court resolves the objection below. The Court need not and does not resolve the remaining objections.

Iannuzzi Aff. ¶¶ 7-8; Bovin Dep. 9-10). Monster is a publicly traded company, today owned by Randstad Holding NV ("Randstad"), which is known primarily for operating the online recruiting and employment website www.monster.com. (DX-110; Iannuzzi Aff. ¶ 3; Yates Aff. ¶¶ 3, 6). Salvatore Iannuzzi, who served as Chief Executive Officer of Monster from April 2007 to November 2014, and Timothy Yates, who served as (among other things) Chief Financial Officer of the Company from June 2007 to January 2011 and then Chief Executive Officer from November 2014 to November 2016, had done work with Bovin when Bovin was at Bear Stearns and, based on that relationship, helped Stone Key get off the ground when it was founded. (Iannuzzi Aff. ¶¶ 3, 6-10; Yates Aff. ¶¶ 3, 6, 8-12). Most significantly, Monster provided Stone Key with office space at the Company's New York offices (initially free of charge), and engaged the new bank to assist with the acquisition of another job search site. (Iannuzzi Aff. ¶¶ 9-10). On October 14, 2008, Monster and Stone Key also entered into the first in a series of retainer agreements pursuant to which Stone Key provided Monster with general financial advisory services. (PX-2; PX-7; PX-9; PX-29; Iannuzzi Aff. ¶ 11; Yates Aff. ¶ 10). The initial agreement was for a period of one year, but it was renewed each year through 2013. (*Id.*).

In early 2012, Monster was facing "severe competitive pressures" and began to consider a sale of the Company. (Iannuzzi Aff. ¶ 15; Yates Aff. ¶ 14; DX-5, at 1). In February 2012, Monster invited Stone Key and Bank of America Merrill Lynch ("BAML"), another investment bank with which the Company had a relationship, to make a presentation to Monster's Board of Directors about a potential "review of strategic alternatives." (PX-20; Yates Aff. ¶ 16). As contemporaneous documents make clear, and witnesses at trial confirmed, the parties contemplated that the "review of strategic alternatives" would last approximately six to twelve months and would encompass either a sale or a partial sale of the Company. (*See* Yates Aff.

¶ 18; Iannuzzi Aff. ¶ 18; McVeigh Aff. ¶ 9; DX-9, at 10-11; DX-15, at 10-11; Tr. 231-36, 376-80, 430).  A slide in the presentation to the Board of Directors also made clear that the "review of strategic alternatives" could end with a decision to "Maintain 'Status Quo.'"  (DX-9, at 10).  To signify that the "review" could end without a sale transaction, the slide included an arrow from "Maintain 'Status Quo'" to the depiction of a "STOP" sign.  (*Id.*).

Following the presentation by Stone Key and BAML, Monster's Board authorized management to begin the review of strategic alternatives.  (DX-8, at 6).  On March 1, 2012, Monster publicly announced the review, (DX-10), and on March 5, 2012, the Company publicly announced that it had "retained" Stone Key and BAML as financial advisors in connection with the review.  (PX-22).  Despite that announcement, it was not until April 20, 2012, that Monster and Stone Key actually formalized the engagement.  On that date, the two companies signed an extension of their general advisor retainer agreement.  (PX-29).  More relevant here, however, the parties also entered into the Engagement Letter, pursuant to which Monster "engage[d]" Stone Key to act jointly with BAML "as the Company's financial advisor in connection with a review of strategic alternatives, including the possible sale of the Company or the sale of an equity interest in the Company."  (PX-28 ("Engagement Letter"), §§ 1-2).  Four days later, Monster signed a separate, but similar, engagement letter with BAML.  (DX-20).

Pursuant to the Engagement Letter, Stone Key agreed "to assist" with the following tasks "to the extent requested by" Monster:

(a) Review and analysis of the business, financial condition and prospects of the Company and any Acquiror;

(b) Preparation of marketing materials concerning the Company and the Transaction . . . ;

(c) Preparation and implementation of a marketing plan;

(d) Solicitation of proposals from prospective Acquirors;

(e) Review of proposals received from prospective Acquirors;

(f) Review and analysis of the structure and terms of a proposed Transaction from a financial point of view;

(g) Negotiation and implementation of the Transaction; and

(h) Providing such other related services as may reasonably be requested by the Company in connection with the Transaction.

(*Id.* § 2). For its part, Monster agreed to compensate Stone Key, but only in the event of a qualifying "Transaction," defined as "any transaction or series of related transactions whereby, directly or indirectly, control of the Company, or control of at least a majority of its businesses, subsidiaries, divisions, operations or assets, is transferred by the Company and/or its affiliates for consideration." (*Id.* § 2). More specifically, the Engagement Letter identified three types of qualifying Transactions for which compensation would be due, two of which are relevant here:

- a "Sale Transaction," defined as "a Transaction in which a majority of the voting securities of the Company or all or substantially all of the assets of the Company and its subsidiaries taken as a whole are transferred"; and

- a "Partial Sale Transaction," defined to "include any Transaction involving the sale of a material portion of the assets or operations of the Company and its subsidiaries taken as a whole that does not constitute a Sale Transaction."

(*Id.* § 3). In the event of the former, Monster agreed to pay Stone Key $1,925,000 upon signing and an additional fee upon consummation of the sale. (*Id.* §§ 4(a), (b)). And in the event of the latter, Monster agreed to pay "a fee in an amount equal to 55% of the fee that shall be mutually acceptable to the Company and Stone Key and consistent with compensation agreements customarily agreed to by nationally recognized investment banking firms for transactions of similar size and complexity where there are two co-financial advisors." (*Id.* § 4(d)).

The Engagement Letter contained two other provisions relevant to the parties' current dispute. First, Monster agreed to "promptly reimburse Stone Key, periodically upon request, for all out-of-pocket expenses reasonably incurred, invoiced and documented . . . in connection with

Stone Key's rendering its services under [the] Agreement." (*Id.* § 5). And second, the Engagement Letter provided that either party could terminate the engagement "at any time" upon written notice. (*Id.* § 6). Significantly, that same clause also included a "tail provision," pursuant to which Stone Key would "continue to be entitled" to compensation if a Sale Transaction or Partial Sale Transaction "with a party . . . with whom Stone Key or the Company had substantive discussions with respect to" a Sale Transaction or Partial Sale Transaction "during the term of Stone Key's engagement hereunder . . . is consummated prior to the expiration of 12 months after any termination of Stone Key's engagement hereunder." (*Id.*).

**B. The Review of Strategic Alternatives**

Once Monster's Board approved the review on March 1, 2012, Stone Key and BAML began working with Monster to develop a list of prospective buyers and to create marketing materials, non-disclosure agreements, and information that would be included in a "virtual data room" to assist with due diligence. (Urfirer Aff. ¶ 76; Iannuzzi Aff. ¶ 31). By late March 2012, Stone Key and BAML had begun an outreach campaign to potential investors and buyers. (Urfirer Aff. ¶ 54). As of June 14, 2012, one or the other or both had contacted over eighty potential purchasers and non-disclosure agreements had been executed with thirty-seven prospective buyers. (PX-32). Preliminary bids for the Company ranged from $10 per share to $16 per share. (*Id.*). At or about the same time, Monster's Board had already begun to consider alternative plans in case "the strategic alternatives process [did] not yield a result that was in the best interests of the shareholders." (DX-21, at 3). That August, Monster set September 10, 2012, as "the due date for final bids from interested parties." (DX-25, at 2).

In September 2012, Monster began earnest discussions with Symphony Technology Group ("Symphony") regarding a potential acquisition. (Urfirer Aff. ¶¶ 81; PX-35; PX-36).

When Symphony's bid came in too low, however, Monster rejected the offer and directed Symphony to destroy all confidential material. (Urfirer Aff. ¶ 82; PX-38). By January 20, 2013, talks with Symphony ended conclusively when the parties could not agree on a price. (DX-32, at 4; Iannuzzi Aff. ¶ 39; Yates Aff. ¶ 32). Soon thereafter, Monster entered serious discussions with Platinum Equity ("Platinum"). (Urfirer Aff. ¶ 86). By the end of April 2013, however, Iannuzzi, — Monster's CEO at the time — told Monster's Board that he thought the talks with Platinum would end soon, and he requested that the Board authorize a share buyback plan to be implemented as soon as the talks did end. (DX-42, at 3). On a May 2, 2013 earnings call, Iannuzzi disclosed to investors that the Board had authorized such a plan, which would be executed once conversations with prospective buyers ended. (DX-45, at 4-5, 12). Conversations with Platinum did end on May 21, 2013. (Iannuzzi Aff. ¶ 49; Urfirer Aff. ¶ 87; Yates Aff. ¶ 38). One day later, Monster executed a $200 million share buyback plan, (Iannuzzi Aff. ¶ 55), and on July 18, 2013, the Company closed its virtual data room. (DX-59). On an August 1, 2013 earnings call, Iannuzzi told investors that "active conversations with regard to the potential sale of [Monster] [had] c[o]me to a conclusion." (PX-70, at 4). Iannuzzi acknowledged that a buyer could always come along and stated that Monster was "prepared, in any point in time, to engage in conversations." (*Id.* at 14). Nonetheless, Iannuzzi made clear that Monster was not actively pursuing a sale and had turned its attention to "intensively investigating, building and expanding Monster's presence [in the United States] and overseas." (*Id.*). Most significantly, Iannuzzi announced that Monster had initiated the previously announced share buyback plan. (*Id.* at 4).

There is little evidence in the record that Stone Key or BAML did much work on the review of strategic alternatives after the submission of final bids in September 2012. James McVeigh, one of Monster's main contacts at BAML during the review (Yates Aff. ¶ 15;

McVeigh Aff. ¶ 14), testified that the work of Stone Key's counterpart, BAML, "had decreased significantly" by the end of 2012 and that BAML was "no longer preparing marketing materials or identifying potential new purchasers."  (McVeigh Aff. ¶ 20).  Likewise, Yates testified that he personally considered Stone Key's engagement to have ended during the fall of 2012 because "work . . . had stopped" by then.  (Tr. 263-64).  Bovin testified that he had no recollection of Stone Key performing any of the services identified in the Engagement Letter after May 2013.  (Bovin Dep. 118-19).  Urfirer himself admitted that, after May 2013, Stone Key's daily work under the Engagement Letter "diminished dramatically," eventually becoming "dormant," and that he could identify no services performed by Stone Key under the Engagement Letter after August 2013.  (Urfirer Aff. ¶ 88-89; Urfirer Dep. 217).  It is undisputed that Stone Key did not perform any work whatsoever for Monster after April 2014, when Bovin resigned from Stone Key.  (Docket No. 57-1, Ex. 1 ("Pl.'s PCL"), ¶ 30; Docket No. 58 ("Def.'s PFF"), ¶ 107; Urfirer Aff. ¶ 94).   Neither Stone Key nor Monster terminated the Engagement Letter in writing.

## C.  The Job Korea Transactions and Sale of the Company

In December 2013, Monster sold a 49.99% interest in JobKorea, a Korean subsidiary of Monster, to H&Q Asia Pacific, Ltd. ("H&Q"), a private equity fund that had first approached Iannuzzi about investing in JobKorea in March 2013.  (DX-40; DX-83).  Negotiations between H&Q and Monster took place over the course of July, resulting in a draft Memorandum of Understanding, the terms of which were presented to Monster's Board the same month.  (PX-65; PX-68; PX-69).  On that same date, Monster signed a new engagement letter with BAML.  (DX-60).  Under the new engagement letter, Monster agreed to pay BAML $2.5 million for a fairness opinion for JobKorea I and to reimburse BAML for services it had provided to Monster as its primary commercial lender.  (DX-60; Iannuzzi Aff. ¶¶ 65-66; Yates Aff. ¶ 51).  The JobKorea I

transaction closed on December 19, 2013. (Iannuzzi Aff. ¶ 78; DX-83). Stone Key did not work on the JobKorea I transaction itself — though Urfirer testified that he "believe[d]" the bank had done some "valuation work" that Monster used when H&Q first inquired about a deal. (Tr. 70).

Monster announced JobKorea I to the public on November 7, 2013, but by October, Stone Key knew the transaction was close to final. In an October 18, 2013 e-mail, Bovin informed a number of Stone Key employees, including Urfirer, that Monster was close to "finalizing the sale of 49% of its Korea operations for $90 million to HG Korea" — identifying H&Q by the wrong name. (DX-72). On October 31, 2018, Bovin told the Stone Key team that Monster expected to close JobKorea I within the week. (DX-75). Around this time, Bovin congratulated Iannuzzi on the deal. (Iannuzzi Aff. ¶ 70; Tr. 412). Notably, however, Stone Key did not seek a fee from Monster pursuant to the Engagement Letter at the time of the transaction. Indeed, Bovin testified that he and Urfirer did not even discuss seeking a fee for JobKorea I. (Bovin Dep. 123, 125-26). Nor did either of them, or anyone else at Stone Key, take any steps to document a belief that the bank was entitled to a fee, let alone calculate a fee. (Tr. 72-73).

In November 2014, Yates took over as CEO of Monster. (Yates Aff. ¶ 6). Monster and Stone Key had been out of contact since April 2014, when Bovin resigned from Stone Key, and no one at Stone Key made any effort to contact Yates when he took over as CEO. (Urfirer Dep. 222-23; Hubbard Dep. 173). Then, in 2015, H&Q expressed interest in buying Monster's remaining share of JobKorea ("JobKorea II"). (DX-88). In July 2015, Monster engaged Evercore — another investment bank, to which Bovin had decamped in April 2014, after a falling out with Urfirer — paying it $1 million for JobKorea II and for services Evercore was already providing Monster. (DX-89; Yates Aff. ¶ 57; Bovin Dep. 158). Monster sold the remaining 50.01% of JobKorea to H&Q on October 13, 2015. (Yates Aff. ¶ 55; DX-94). It is

undisputed that Stone Key did "absolutely" no work on the JobKorea II transaction. (Tr. 83). Once again, Stone Key did not seek a fee from Monster at the time. (Tr. 81-82). And once again, there is no contemporaneous documentation within Stone Key reflecting that Urfirer or anyone else there believed that the bank was entitled to a fee for the transaction. (*Id.* at 83).

Soon after JobKorea II, Monster began to consider a sale of the whole Company. Unlike in 2012 and 2013, Monster decided against engaging in "a process in which the potential sale of Monster were actively, openly and widely pursued," and instead fielded inquiries informally. (PX-145, at 2). On August 9, 2016, Monster announced a merger agreement pursuant to which Randstad agreed to acquire all of Monster's outstanding shares at $3.40 per share. (PX-98). The deal closed on November 1, 2016. (DX-116). Within hours of the deal being announced, Urfirer had contacted his attorney about the Randstad Transaction. (Tr. 54-56). And two days later, Stone Key sent Monster a letter demanding, pursuant to the Engagement Letter, a fee of $2,949,375 for the Randstad Transaction. (DX-103). The claim was reiterated in letters sent in September 2016 and mid-February 2017. (DX-109; DX-113; DX-117). In its mid-February letter, Stone Key added an additional demand for fees relating to the 2013 and 2015 JobKorea transactions, as well as for expenses allegedly owed under the Engagement Letter. (DX-117). In total, Stone Key demanded $8,890,596 in fees and $47,339.01 in expenses. Until Stone Key's demand letters, Monster and Stone Key had not been in contact since April 2014, when Bovin — Monster's primary contact — had departed Stone Key. (PX-85; Urfirer Dep. 222-23).

## LEGAL STANDARDS

The applicable legal standards, derived from New York law, are well established and undisputed. (*See* Docket No. 83, Ex. 1, ¶ 1). "Under New York law, a plaintiff bears the burden of proving a breach of contract by a preponderance of the evidence." *Meda AB v. 3M Co.*, 969 F.

Supp. 2d 360, 378 (S.D.N.Y. 2013).  To establish a breach of contract, a plaintiff must show

"(1) the existence of an agreement, (2) adequate performance of the contract by the claimant,

(3) breach of contract by the accused, and (4) damages."  *Stadt v. Fox News Network LLC*, 719

F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted).  "[T]he

fundamental objective of contract interpretation is to give effect to the expressed intentions of the

parties."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).  The

"best evidence" of the parties' intent, of course, "is the contract itself."  *Gary Friedrich*

*Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013).

In a dispute over the meaning of a contract, the threshold question is whether the relevant

contract terms are ambiguous.  *See, e.g.*, *Great Minds v. Fedex Office & Print Servs., Inc.*, 886

F.3d 91, 94 (2d Cir. 2018).  "[A]mbiguity exists where a contract term could suggest more than

one meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology as generally understood in the particular trade or business."  *Bayerische*

*Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (internal quotation

marks omitted).  By contrast, a contract is unambiguous when it has "a definite and precise

meaning . . . concerning which there is no reasonable basis for a difference of opinion."  *Orchard*

*Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016).  Where a term

is ambiguous, a court may consider extrinsic evidence to determine the parties' intent.  *Matter of*

*MPM Silicones*, 874 F.3d at 796; *see also Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27

(2d Cir. 1988).  That evidence may include "any relevant course of dealing and course of

performance."  *Meda AB*, 969 F. Supp. 2d at 378.  "[T]he practical interpretation of a contract by

the parties manifested by their conduct subsequent to its formation for any considerable length of

time before it becomes a subject of controversy, is entitled to great . . . weight." *Disney Enters., Inc. v. Finanz St. Honore, B.V.*, No. 13-CV-6338 (NG) (SMG), 2016 WL 7174650, at *6 (E.D.N.Y. Dec. 5, 2016); *see also Peter J. Solomon Co., L.P. v. Oneida Ltd.* ("*Oneida II*"), No. 09-CV-2229 (DC), 2010 WL 234827, at *3 (S.D.N.Y. Jan. 22, 2010) ("[T]he subsequent conduct of the parties may be used to indicate their intent.").

## DISCUSSION

There is no dispute that Stone Key satisfies the first two elements of a breach-of-contract claim: (1) the existence of a contract — namely, the Engagement Letter; and (2) Stone Key's performance under that contract. Instead, the dispute is whether Monster breached the Engagement Letter by refusing to pay Stone Key fees and expenses in relation to JobKorea I, JobKorea II, and the Randstad Transaction. Monster argues that the Engagement Letter was completed before any of the three transactions took place. If no relevant provisions of the Engagement Letter remained in effect at the time of the three transactions, then Monster could not have breached the contract and Stone Key has no claim. Stone Key counters that there were only two ways the Engagement Letter could have been completed: either through a Sale Transaction or by written notice of termination. Because Monster never provided written notice, Stone Key argues, the Engagement Letter remained open until the Randstad Transaction. Thus, whether Stone Key is entitled to fees for either of the JobKorea transactions or the Randstad Transaction turns, at least in part, on whether the Engagement Letter was still in effect at the time of those transactions. Accordingly, it is to that question that the Court turns first.

## A.  Whether and When Stone Key's Engagement Ended

It is undisputed that neither party ever terminated the Engagement Letter in writing pursuant to Section 6. At the same time, there is no dispute (or, at least, no longer any dispute)

that the Engagement Letter could end in another way: through completion. In their pretrial submissions, both parties appeared to acknowledge that written termination was not the only way the Engagement Letter could end. (Pl.'s PCL ¶ 29 ("Stone Key's engagement could [] be terminated upon written notice . . . [or] completed by the consummation of a Sale Transaction and payment of Stone Key's fees."); Def.'s PCL ¶ 11 ("[B]y limiting the scope of Stone Key's engagement . . . the parties expressly agreed that the engagement could end with [] completion . . . .")). And at oral argument after trial, Stone Key explicitly conceded the point. (Tr. 453-54). That is for good reason, as the Engagement Letter itself expressly refers (in connection with an indemnification agreement incorporated by reference into the Agreement) to "the termination, modification, or *completion* of the engagement of Stone Key." (Engagement Letter 15 (emphasis added)). Additionally, New York precedent holds that an agreement with a limited purpose concludes when the purpose for which it was created ends. *See, e.g.*, *In re Oneida, Ltd.* ("*Oneida I*"), 400 B.R. 384, 391 (Bankr. S.D.N.Y. 2009) (noting that, to require written termination where a limited-purpose contract has run its course, would "extend the scope of the engagement" and "convert the [agreement] into an open-ended advisory contract").

That said, the parties vehemently disagree with respect to what qualifies as "completion" of the contract. Monster claims that the contract was completed once the "review of strategic alternatives" for which Stone Key was hired came to an end — whether or not Monster sold the company or completed any transaction at all. (*See* Def.'s PFF ¶ 55 ("Upon the conclusion of the Review, whether successful or unsuccessful, Stone Key's engagement under the Engagement Letter would be completed."); *see also id.* ¶ 56; Tr. 480 (arguing that the parties involved did not send a termination letter because, once the process ended without success, they believed the engagement had ended)). Stone Key claims that the contract could be completed only with "the

sale of the company and [Monster's] payment of [Stone Key's] fees." (Tr. 454; *see also id.* at 454-56; Pl.'s PCL ¶ 25 ("Monster's engagement of Stone Key under the Engagement Letter could not be deemed to have been completed before Monster consummated a Sale Transaction (as defined in the Engagement Letter) and paid Stone Key's final invoice.")). That is, on Stone Key's view, the Engagement Letter remained open until Monster was sold and, until that point, absent written notice, Monster remained entitled to seek Stone Key's advice and Stone Key remained entitled to a fee in the case of a qualifying transaction. (Tr. 461).

Monster plainly has the better of the argument. First, as a matter of law, courts have held that a limited-purpose engagement can end even if the project for which a party was engaged does not end with a successful transaction. *See, e.g.*, *Argilus, LLC v. PNC Fin. Servs. Grp., Inc.*, 419 F. App'x 115, 119 (2d Cir. 2011) (finding that the parties' relationship "came to an end . . . when it became clear that the . . . proposal would not be accepted"). That is, a limited-purpose contract — which the Engagement Letter indisputably was — ends when the purpose for which it was entered ends. *See In re Dorrough, Parks & Co.*, 173 B.R. 135, 141 (Bankr. E.D. Tenn. 1994) ("The parties entered a contract with a finite duration: the debtor was to perform the public offering work, and once the public offering was completed, the contract ended."), *aff'd*, 185 B.R. 46 (E.D. Tenn. 1995).[2] As discussed below, Stone Key and Monster entered the Engagement Letter for the purpose of pursuing a sale of the Company; nothing in that agreement required

---

[2]     Stone Key argues that, "as a matter of contract law," completion required the complete sale of the company *and* payment to Stone Key. (Tr. 456). But the only case cited by Stone Key for that proposition is *Oneida*, which happened to feature a completed transaction but which by no means held that a successful transaction (never mind a company's sale) was the only way, other than written termination, to complete a limited-purpose engagement letter. *See Oneida I*, 400 B.R. 384; *Oneida II*, 2010 WL 234827. Notably, the Court in *Oneida I* held that the engagement there had been completed following a "Restructuring Transaction," even though the parties' engagement letter contemplated the consummation of a "Sale Transaction." *See Oneida I*, 400 B.R. at 387; *Oneida II*, 2010 WL 234827, at *3.

Monster to actually sell itself in order for the pursuit of a sale to come to an end. *Cf. Am. Inv. & Mgmt. Co. v. Arab Banking Corp.*, No. CIV. A. 91-0040, 1993 WL 54601, at *4 (D.D.C. Feb. 18, 1993) (holding that where a written contract provided for a fee only in the case of a successful transaction, no fee was due when no transaction proved successful).

Second, as a matter of common sense, the Engagement Letter could plainly end without written termination or a successful sale of the Company. To see why that is, one need only assume that Monster entered a Sale Transaction *thirty years* after the parties entered the Engagement Letter and *twenty-eight years* after the last contact between the parties (that is, to change the date of the Randstad Acquisition from 2016 to 2042, but otherwise keep the facts of the case the same). In such a scenario, it would be absurd to suggest that the parties' contract remained in effect — even without written notice — and Stone Key wisely conceded as much during oral argument at the conclusion of the case. (Tr. 456-57). While wise, however, that concession is also fatal to Stone Key's argument that the Engagement Letter could end only through written termination or a successful sale of the Company. That is, by conceding that Stone Key could not enforce the Engagement Letter twenty-eight years after the parties' last contact, Stone Key concedes that the contract *could* be completed through some means other than written termination or a successful sale of the Company. The relevant question then becomes merely one of line-drawing — namely, determining *when* the contract was completed.

Finally, and most significantly, Monster's position is supported by extrinsic evidence of the parties' understanding of "completion" — to which the Court may look because the meaning of the term in the Engagement Letter is ambiguous. (*See* Def.'s PCL ¶ 78 (arguing that the Court must look to the parties' course of dealing to establish when Stone Key's engagement was completed); Tr. 455 (Stone Key conceding that the meaning of "completion" was not "spelled

out" in the Engagement Letter)).  From the start, the parties plainly understood that Stone Key was primarily engaged to advise Monster in connection with a sales process, the principal goal of which was to sell the Company.  That was the understanding of Bovin, who negotiated the Engagement Letter, (Bovin Dep. 39), and of Ryan Hubbard, a Stone Key vice president who "co-quarterbacked" the strategic review on behalf of the bank and who spent sixty to seventy percent of his time on it.  (Hubbard Dep. 10, 44, 46, 51).  That was also the understanding of Monster's officers.  At trial, Timothy Yates, who was Monster's Executive Vice President at the time the Engagement Letter was signed, (Yates Aff. ¶ 3), testified that "[t]he major focus [of the process] was on selling the whole company.  The secondary focus was on finding a strategic buyer, which could be affected [sic] either through a ['private investment in public equity'] or through in some cases a partial sale transaction."  (Tr. 287).  And as Iannuzzi testified, "[t]he thrust of everything we did, everything we prepared was with regard to the sale of the entire company."  (Tr. 379).  Contemporaneous documentation supports that understanding.  In a list of sixty-seven potential investors and purchasers provided by Stone Key in early April 2012, just before the Engagement Letter was signed, sixty-two were listed as prospective acquirers of the entire company, while only thirteen were considered for a partial purchase of assets and thirty-two for a private investment in public equity.  (PX-25, at 23-26).  By June 2012, twelve of the fifteen companies that had expressed serious interest in Monster were seeking to acquire Monster as a whole; and the two parties with whom Monster had earnest discussions over the course of 2012 and 2013 — Symphony and Platinum — were both interested in an acquisition.  (PX-32, at 2).

Additionally, extrinsic evidence makes clear that the parties understood that the review would be conducted on a limited timeline and might end without a transaction.  According to McVeigh, BAML's representative on the review of strategic alternatives, "maintaining the status

quo was always an option for [Monster]."  (McVeigh Aff. ¶ 12; *see also* Tr. 251 (Yates testifying that "different people . . . put different odds on [the possibility] that the sale process was not going to result in a sale"); Hubbard Dep. 69 (noting that an "option in any strategic alternatives review" is the "status quo," where "management doesn't undertake a transaction and continues to run and operate the business as it has been doing")).  Indeed, in an "illustrative time line" that was part of its February 28, 2012 presentation to Monster's Board, Stone Key included the possibility that Monster's Board would decide to maintain the "status quo," clearly indicating that such a decision would bring the review to an end by drawing an arrow from that outcome to the representation of a stop sign.  (*See* PX-20, at 10; *see also* PX-25, at 13 (describing the "pros" and "cons" of "stay[ing] the course")).[3]  The timeline as a whole showcases a forward-flowing process heading toward several potential completion points; nothing about it suggests that the process might lie dormant and then restart, let alone cycle back through a previously completed stage.  In fact, no document in evidence suggests as much.

Over the course of 2012 and the first half of 2013, the parties continued to signal that the process would unfold over a discrete period.  Timelines were reviewed, resolutions were discussed, and a due date for final bids was set.  (*See* PX-143, at 3; DX-24, at 2-3; DX-25, at 2).  As potential bidders narrowed during the last half of 2012 and first half of 2013, first to two and then to one, the parties began to anticipate the end of the process.  In February 2013, the Stone Key team proposed language for a Monster press release letting the market know there could be "no assurance that [the] strategic review process [would] result in a transaction."  (DX-34, at 1).

---

[3]        Urfirer tried to minimize the significance of the stop sign by noting that it was "outside" the box containing the four possible outcomes of the strategic alternatives review, (Tr. 29), but that is risible.  Notably, Hubbard concurred that the stop sign signified that the strategic review could end without a transaction.  (Hubbard Dep. 69; *see also* Bovin Dep. 44-45 (agreeing that maintaining the status quo was an option)).

Significantly, the draft language referenced two different possible outcomes: "a specific transaction," Stone Key's draft stated, could be approved by the Board of the Directors *or* "the review process [could be] concluded." (*Id.*). That the two were phrased in the alternative makes plain that Stone Key was well aware that the review process might "conclude[]" *without* "a specific transaction." In an earnings call three days later, Iannuzzi informed investors that Monster was "spending little additional management or financial resource[s] in pursuit of" the review of strategic alternatives. (DX-35, at 4). And Stone Key anticipated at the time that the process was winding down. When a new buyer approached Stone Key about Monster in March 2013, Hubbard wrote to Bovin and Urfirer: "Between us, there is no chance MWW will engage with a new buyer at this time . . . ." (DX-39, at 2). Bovin agreed. (*Id.* at 1). This is consistent with Yates' testimony that around this time Monster "knew the process was coming to an end" and had instructed Stone Key and BAML "not to open up any new initiatives." (Tr. 272).

Lastly, the parties' understanding that the strategic review could — and did — conclude without a sale is confirmed by the fact that the review did conclude without a sale and that Monster, BAML, and Stone Key all accepted that conclusion. Minutes of the April 30, 2013 Board meeting state that Iannuzzi "indicated that while discussions regarding strategic alternatives were ongoing, he anticipated that the conversations with the final interested party" — Platinum — "would terminate shortly, thereby allowing [Monster] to execute upon a stock buyback plan." (DX-42, at 3). A few days later, Bovin informed the Stone Key team that, if asked, Iannuzzi planned to tell investors that the "process [was] coming to an end, [with] no assurance of a transaction." (DX-44; *see also* Hubbard Dep. 111 (identifying the "process" as "Project Marlin," Stone Key's code name for the strategic review)). Further, when, on May 21, 2013, negotiations with Platinum broke down, it is plain that Monster and Stone Key employees

both understood the review to be effectively over.  Hubbard e-mailed his colleagues: "[Project] Marlin died today."  (DX-49; *see also* Hubbard Dep. 115).  And Bovin, Iannuzzi, and Yates (in his capacity as Monster's Rule 30(b)(6) witness) all testified that this was their own understanding at the time.  (*See* Bovin Dep. 85 (as of May 21, 2013, "the strategic alternatives process for Monster that we and Bank of America were conducting had ended or was in the process of ending"); Iannuzzi Aff. ¶ 52 ("As of May 21, 2013, Monster's publicly-disclosed Review concluded without a transaction."); Yates Dep. 64 ("[I]t is clear to me that the process ended when the conversations with Platinum ended [on May 21, 2013].")).  Moreover, both Yates and Iannuzzi testified — credibly — that they had conversations with Bovin and Hubbard around this time alerting them that Monster considered the sales process over and planned to do no further work on it.  (Tr. 269, 408-10).  That testimony is corroborated by McVeigh, BAML's representative, who testified that — on a date he could not remember, but clearly around May or June 2013 — Yates had called to tell him that the sales process was over, a conversation that McVeigh considered "a formality," because "[t]here was nothing going on" at the time.  (Tr. 428; *see also id.* at 426-28; Yates Aff. ¶ 22).

Any doubt that the strategic review — and, by extension, Stone Key's engagement — had run its course is resolved by the parties' conduct in the days, months, and years following the end of talks with Platinum on May 21, 2013.  For instance, the "virtual data room," which had been established to enable prospective acquirers to conduct due diligence, was shut down on July 18, 2013.  (DX-59; *see also* Bovin Dep. 108-09 (agreeing that it was customary to shut down a virtual data room after a transaction had concluded "either successfully or unsuccessfully")).  And on May 22, 2013 — the very day after the Platinum talks ended — Monster initiated the $200 million share repurchase program that the Board had authorized on April 30, 2013 and that

Monster had, in its May 2, 2013 earnings call, announced would be implemented once conversations with prospective buyers came to an end. (Iannuzzi Aff. ¶ 55; Yates Aff. ¶ 42; DX-42, at 3-4; DX-45, at 4-5, 12). That step is particularly strong evidence of the strategic review having come to a close, as insider trading laws effectively precluded Monster from announcing the buyback program while it was actively trying to find a buyer. (Tr. 403-04; *see* Stowell Aff. ¶ 19; Bovin Dep. 86-87; *see also* DX-45, at 4-5, 12 (Iannuzzi stating, in a May 2, 2013 earnings call that it would be "inappropriate to execute" on the buyback program authorized by the Board while conversations with prospective buyers were ongoing, but that Monster would do so when the conversations ended)). Iannuzzi formally announced the buyback program on August 1, 2013, telling investors that "active conversations with regard to the potential sale of the company came to a conclusion during the second quarter which allowed Monster to pursue its previously announced stock repurchase program." (PX-70, at 4). Notably, financial analysts read those statements as confirmation that Monster's strategic review had come to an end. (DX-65 (stating that Monster "threw in the towel on a 15-month effort to sell the company, a conclusion that had become apparent when [Monster] began repurchasing stock in May"); *see also* DX-62; DX-63).[4] Even more notably, Stone Key employees appear to have done the same, as they ceased regular discussions with Monster about the sales process. (*See* Bovin Dep. 106; Hubbard Dep. 129).

The reaction of Urfirer and Bovin to news of the JobKorea transactions confirms that they did not genuinely believe the Engagement Letter to be open. For one, Bovin called Iannuzzi to congratulate him on the deal at the time (Iannuzzi Aff. ¶ 70; Tr. 412) — a strange thing to do

---

[4]     To be clear, the Court considers the statements of financial analysts as evidence of the market's reaction to Monster's August 1, 2013 announcement, not for the truth of any matter asserted. *See* Fed. R. Evid. 801(c). Accordingly, Stone Key's hearsay objections to those exhibits are overruled. (*See* Docket No. 83, at 19-20).

if he believed that the Engagement Letter was still open and that Stone Key was entitled to a fee. Even more tellingly, Stone Key did not demand a fee for JobKorea I; Bovin and Urfirer did not even discuss Stone Key's entitlement to a fee; and no one at Stone Key documented or calculated what Stone Key's fee for JobKorea I might be.  (Bovin Dep. 123, 125-26; Tr. 72-73).  In fact, Stone Key did not seek a fee for JobKorea I until February 2017 — more than three years after the fact.  (*See* DX-117; Bovin Dep. 127-30; Urfirer Aff. ¶ 111).  Urfirer claims that Stone Key decided to defer discussion of a fee for JobKorea I with Monster until "an appropriate future date" because of Stone Key's historic relationship with Monster and because Stone Key believed that BAML's fee under its 2015 contract with Monster was only $250,000.  (Urfirer Aff. ¶ 111).  But that explanation is incredible.  Stone Key was in dire financial straits at the time of the JobKorea I transaction, so it is hard to imagine that Urfirer and Bovin would have delayed seeking a fee if they had genuinely believed they were entitled to one.  (*See* DX-87; Bovin Dep. 141).  At a minimum, they surely would have spoken to each other about their entitlement to a fee or made an effort to either calculate, or document their entitlement to, a fee.  Yet Urfirer admitted that Stone Key does not possess any contemporaneous documentation of such communication.  (Tr. 72-73, 83).

In short, the evidence is overwhelming that *all* of the participants in the strategic review — Monster, BAML, and Stone Key itself — understood that the review, and thus Stone Key's engagement pursuant to the Engagement Letter, could end without a sale or written termination. More to the point, the evidence is overwhelming that all of those participants understood that the strategic review, and thus Stone Key's engagement pursuant to the Engagement Letter, *did* come to an end.  Fixing the date on which the engagement ended is, of course, difficult given the absence of a written termination letter or other discrete event.  An argument could be made (and

Monster does make it, albeit weakly (Tr. 481-82)) that the engagement ended on May 21, 2013, when Monster's discussions with Platinum ended, or May 22, 2013, when the Company launched its stock repurchase program. But, without a doubt, the engagement had run its course (as Monster argues more forcefully (Def.'s PCL ¶¶ 15, 18; *see also* Tr. 481-82)) by August 1, 2013, when Iannuzzi publicly announced that the stock buyback program had been launched. There is no evidence in the record that Monster and Stone Key communicated about the review after that date, and, as noted, they ceased communicating altogether in April 2014, when Bovin left Stone Key. *Cf. In re Persaud*, 467 B.R. 26, 40 (Bankr. E.D.N.Y. 2012) (finding that an attorney and client's cessation of communications about an engagement and inactivity in their relationship for a year demonstrated that the parties understood the project had ended).

There is little contrary evidence in the record, and none of that evidence is persuasive. The principal evidence to the contrary comes from Urfirer, who testified that *he* understood that the contract could be completed only with a successful sale (or written termination) and that *he* therefore viewed it as in existence well beyond August 2013. (Tr. 130-31). The Court declines to credit that self-serving testimony, based on both the Court's assessment of Urfirer's demeanor in Court and on the fact that his testimony is belied by his own conduct — for example, by the fact that he made no effort to contact Stone Key (let alone demand, calculate, or document that he was owed a fee) when the JobKorea transactions were first announced; and that he did not even make contact with Yates when Yates assumed the role of Monster's CEO in November 2014. Moreover, even if the Court did credit Urfirer's testimony, his understanding of the contract is inconsistent with the overwhelming evidence summarized above that Stone Key's engagement had run its course by August 1, 2013. That evidence includes the testimony of the other principal participants in the relevant events — Bovin, Hubbard, McVeigh, Yates, and

Iannuzzi — all of whom have less of an interest in the outcome of this litigation than Urfirer (and, in many instances, were more directly involved in the review and in the relevant interactions between Monster and Stone Key).[5] It also includes scores of contemporaneous documents — such as Board minutes, slide decks, and e-mails involving Stone Key personnel — reflecting an understanding that Project Marlin, the code name for the strategic review, had "died" by August 1, 2013. (DX-49).

Other than Urfirer's testimony, only two categories of evidence even arguably support Stone Key's position — and neither is enough to carry its burden. The first is a presentation, dated November 19, 2013, and prepared by Stone Key for Monster, stating that "Monster is in the final stages of its strategic alternatives review process that was initiated in March 2012." (DX-82, at 5). Significantly, however, that language was inserted into the document as early as July 2013 — when the strategic review *was* arguably in its "final stages." (*See* DX-58). There is no evidence that it continued to be in its "final stages" four months later. Additionally, the statement was made by Stone Key, not by Monster, and there is no evidence in the record that it was ever shown to representatives of Monster. Finally, the statement is belied by the testimony of the document's author, Hubbard, who declared that Project Marlin "died" on May 21, 2013, when all viable efforts to sell the Company had been exhausted. (*See* DX-49; Hubbard Dep. 44, 123). Stone Key seeks to minimize the significance of Hubbard's assessment by dismissing him as a "junior" banker at Stone Key. (Urfirer Dep. 30; Tr. 93). But, his relative seniority aside,

---

[5] The Court also declines to rely on the testimony of Plaintiff's expert, Matthew Nimetz. For one, Nimetz focused almost exclusively on the issue of written termination and suggested that the engagement between Monster and Stone Key could end only through written termination, (*see* Nimetz Aff. ¶ 45), a position that Stone Key itself has disavowed, (Tr. 453-54). For another, Nimetz reviewed very little extrinsic evidence, (*see* Tr. 169-80), rendering his testimony of limited value in evaluating the scope of Stone Key's engagement under the Engagement Letter given the admitted ambiguity of the term "completion."

Hubbard was arguably more involved in the strategic review than anyone else at Stone Key, (*see* Hubbard Dep. 46 (describing himself as the strategic review's "co-quarterback")), and devoted sixty to seventy percent of his time to the project, (*see id.* at 50-51), so his view carries weight.

The second category of evidence consists of early drafts of a settlement agreement exchanged between Urfirer and Bovin during Bovin's contentious exit from Stone Key in the Spring of 2014. The drafts show that Urfirer suggested, and for a time Bovin accepted, that Bovin could receive compensation from a "current signed engagement[]" with Monster. (PX-84, at 5; *see also* PX-81, at 2; Urfirer Aff. ¶¶ 95-96).[6] Notably, however, while the drafts specified live projects associated with two other engagements ("General Dynamics (Project Atlas)" and "QinetiQ (Project Zebedee)"), they did not specify any particular Monster project or engagement, let alone identify "Project Marlin." (*See* PX-84, at 5). The import of Monster's inclusion in the settlement drafts is thus ambiguous. At most, it proves that Urfirer proposed adding a tail provision for a Monster engagement during what both sides admit were acrimonious negotiations. (Tr. 493-94; Urfirer Dep. 221). But Urfirer may well have done so knowing or thinking there would be no future income from any Monster engagement. Or he may have done so purely speculatively (or because, as early as 2014, he anticipated the position that Stone Key would take in this litigation). Either way, Urfirer's inclusion of Monster in the draft settlement does not reveal much — particularly in the face of Bovin's unambiguous testimony that *he* understood the Engagement Letter to have ended by August 1, 2013. (Bovin Dep. 93).

Admittedly, Monster has no good explanation for its failure to send a written termination notice to Stone Key — except that all of the participants in the strategic review plainly viewed it

---

[6]     Bovin and Urfirer ultimately decided on a different compensation structure that did not include a tail provision for any Monster engagement. (*See* Urfirer Aff. ¶ 96).

as unnecessary (if they thought about it at all) because the engagement had run its course. (*See* Tr. 426-28 (McVeigh describing a call from Yates notifying him that the review had terminated as a "formality" because "[t]here was nothing going on"); Tr. 262 (Yates stating that he never considered sending written notice of termination)). The absence of such written notice was certainly a recipe for litigation, if only because it made it difficult to identify precisely when Stone Key's engagement came to an end and the tail provision began. But the difficulty of dating the engagement's end does not mean that it did not end. To the contrary, the evidence overwhelmingly shows that Stone Key's engagement under the Engagement Letter did end and that it did so no later than August 1, 2018. It follows that Stone Key is not entitled to fees for either JobKorea II or the Randstad Transaction, as both occurred well after the contract ended — and well after any conceivable tail period had run its course. But JobKorea I requires further analysis because it closed in December 2013, within twelve months of the end of the engagement (whether the end is dated May 21, 2013 or August 1, 2013), and Monster (now) concedes that the tail period set forth in Section 6 of the Engagement Letter was triggered by completion of the contract.[7] That is, because JobKorea I occurred within twelve months of August 1, 2013, and Monster indisputably conducted substantive discussions with its counterparty prior to that date (*see* PX-65; PX-68; PX-69), the completion of the contract does not answer the question of whether Stone Key is entitled to a fee for that particular transaction.

---

[7] An argument could perhaps have been made that the tail provision applied only in the event of written termination. In fact, Monster seemed to take that position in pre-trial submissions. (*See* Def.'s PCL ¶ 25; Def.'s PFF ¶ 59). At the conclusion of trial, however, Monster conceded that the tail provision applied in the case of completion without written termination as well — a concession no doubt prompted by the fact that every one of its own witnesses agreed with that understanding of the tail provision. (Tr. 481).

**B. JobKorea I**

Although completion of the contract does not preclude Stone Key from recovering a fee for JobKorea I, the Court concludes that the bank is precluded from doing so for at least two other reasons. First, the Court concludes that JobKorea I did not qualify as a "Partial Sale Transaction" within the meaning of the Engagement Letter. As noted, Section 3(c) of the Engagement Letter defines a "Partial Sale Transaction" as "any Transaction involving the sale of a material portion of the assets or operations of the Company and its subsidiaries taken as a whole that does not constitute a Sale Transaction." (Engagement Letter § 3(c)). At oral argument, Stone Key's counsel conceded that Monster retained operational control over JobKorea after selling H&Q Capital a minority stake in the company (or at least that there was no evidence in the record suggesting otherwise). (Tr. 466-67; *see also* Tr. 363 (David Stowell, Monster's expert, testifying that Monster "owned the operations" of JobKorea before and after JobKorea I); Tr. 393-94 (Iannuzzi noting that Monster maintained "full operational control" of JobKorea after JobKorea I)). Hence, it cannot be said that JobKorea I involved the sale of a material portion of the *operations* of Monster and its subsidiaries — let alone a material portion of the operations Monster and its subsidiaries "taken as a whole." (Engagement Letter § 3(c)). Thus, to prove that JobKorea I qualified as a Partial Sale Transaction, Stone Key would have to show that it involved "the sale of a material portion of the *assets* . . . of the Company and its subsidiaries taken as a whole." (*Id.* (emphasis added)). Stone Key failed to do so.

The Engagement Letter does not define what portion of assets would qualify as "material." In the securities fraud context, courts in this Circuit have "typically" used five percent as "the numerical threshold . . . for quantitative materiality." *Dekalb Cty. Emps.' Ret. Sys. v. Controladora Vuela Compania De Aviacion, S.A.B. de C.V.*, No. 15-CV-1337 (WHP),

2016 WL 3685089, at *4 (S.D.N.Y. July 6, 2016).  This case is not, of course, a securities fraud

case.  Nevertheless, Stone Key identifies no other legal standard by which to measure the

materiality of a portion of assets — and, in fact, relies itself on securities fraud cases to argue

that the sale of 49.9% of JobKorea's assets was *not* immaterial as a matter of law.  (Docket No.

57 ("Pl.'s PFF"), ¶ 80).  Accordingly, the Court will use that standard here.  Measured against it,

the 49.9% stake in JobKorea plainly did not qualify as a "material portion" of the assets of

Monster and its subsidiaries because, as Monster's expert Stowell explained, that stake

constituted less than four percent of the Company's "total assets."  (Stowell Aff. ¶ 38 n.40 ("As

of the 3rd quarter 2013, total assets of JobKorea were $113 million, and 49.99% of this equals

$56,567,389.  Total assets of the Company at the same time were $1.54 billion. $56.5

million/$1.54 billion = $3.7%."); *see also* DX-70; Tr. 430-31 (McVeigh explaining that he

viewed JobKorea I as separate from the Engagement Letter because JobKorea I was "a minority

asset, a small asset, relative to the company")).  Stone Key's only argument to the contrary is that

Monster's assets should be measured according to their fair market value and that JobKorea I

was "greater than ten percent of the enterprise value of Monster."  (Tr. 467).  But Stone Key

provides no basis to conclude that the Engagement Letter's reference to "assets" means anything

other than the standard accounting concept of "book value" — that is, the assets that appear on a

balance sheet.  (*See* Tr. 337 (Stowell describing the "book value" of assets)).[8]

---

[8]     Stone Key also suggests that the transaction was "material" because the announcement of
JobKorea I "resulted in a one-day increase in Monster's stock price in excess of 15%."  (Pl.'s
PFF ¶ 79).  But that argument disregards the plain language of the Engagement Letter, which
does not ask whether the *transaction* was material, but whether it involved the sale of a material
portion of the Company's *assets*.  (Engagement Ltr. § 3(c)).  Moreover, Stone Key did not
conduct an event study, so it is speculative to say that the increase in stock price was attributable,
let only entirely so, to JobKorea I.  Finally, if JobKorea was as fundamental to Monster's
business as Stone Key suggests, one would expect its stock to have dropped, not risen, after

Second, and in any event, Stone Key is barred from collecting a fee because the Engagement Letter's "Partial Sale Transaction" fee provision is an invalid agreement to agree. Under New York law, "there can be no legally enforceable contract" where an agreement "is not reasonably certain in its material terms." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 548 N.E.2d 203, 482 (N.Y. 1989). Thus, "a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 541 (N.Y. 1981). "A compensation term is not indefinite . . . simply because it fails to specify a dollar figure or a particular compensation formula to be employed in calculating compensation." *Benevento v. RJR Nabisco, Inc.*, No. 89-CV-6266 (PKL), 1993 WL 126424, at *5 (S.D.N.Y. Apr. 1, 1993). Nevertheless, a price term may be insufficiently definite where "the amount can[not] be determined objectively without the need for new expressions by the parties." *Cobble Hill Nursing Home*, 548 N.E.2d at 483. When compensation is calculated "with reference to industry standards or customs, the plaintiff must establish that the omitted term is fixed and invariable in the industry in question." *Benevento*, 1993 WL 126424, at *7 (citing *Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir. 1984) (internal quotation marks omitted)).

Applying those standards here, the Court concludes that the Engagement Letter's Partial Sale Transaction fee provision is unenforceable. That provision — Section 4(d) — states that, in the event of a qualifying transaction, Monster will pay Stone Key "an amount equal to 55% of the fee that shall be *mutually acceptable* to the Company and Stone Key and consistent with compensation agreements customarily agreed to by nationally recognized investment banking

---

Monster announced the sale of a 49.9% stake in the subsidiary. (*See* Docket No. 75-1 ("Def.'s PCL Response"), ¶ 105).

firms for transactions of similar size and complexity where there are two co-financial advisors."
(Engagement Letter § 4(d) (emphasis added)).  By its terms, therefore, the provision calls for a
"new expression[]" by the parties in the event of a qualifying transaction.  *Cobble Hill Nursing
Home,* 74 N.Y.2d at 483.  Moreover, it "contains no methodology, formula, or external measure
by which the Court might objectively determine the compensation to be paid."  *GEM Advisors,
Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 326 (S.D.N.Y. 2009).  That "vagueness
is fatal" to Stone Key's claim with respect to JobKorea I.  *Id.* at 327; *see also id.* at 326 (reaching
the same conclusion with respect to a compensation provision providing that the plaintiff's fee
"shall be mutually agreed" between the parties "in an average range of 2.0% . . . of each
Transaction Value"); *Benevento*, 1993 WL 126424, at *6 (reaching the same conclusion with
respect to a compensation provision calling for a "mutually agreed upon" fee determined "in
accordance with," or "with reference to," "comparable investment banking standards" (internal
quotation marks omitted)).

 That conclusion is reinforced by other evidence in the record.  At trial, witnesses for both
sides agreed that Section 4(d) would call, in the first instance, for a "fee run" — an analysis of
publicly available investment banking fees for comparable "precedent transactions."  (*See* Tr. 84-
91, 347, 353-54, 432-34).  As Stone Key's own arguments reveal, however, there is no "fixed
and invariable standard" for conducting a fee run.  *Benevento*, 1993 WL 126424, at *7 (internal
quotation marks omitted).  Stone Key used publicly available investment banking fees for
transactions between $50 million and $100 million announced between January 1, 2009 and
December 31, 2013.  (PX-113, at 13-18).  Stone Key then proceeded to consider only the top two
quartiles of those fees and, within those top two quartiles, transactions from the mean fee amount
(as opposed to the minimum fee amount) to the maximum fee amount.  (*See id.* at 13; *see also*

Docket No. 81, ¶ 4). After doing that, Stone Key added a 25-50% co-advisor premium to the implied transaction fee. (PX-113, at 10-11). In doing so, however, Stone Key made a number of subjective choices — for example, to consider fees for transactions between $50 million and $100 million, to consider just some rather than all quartiles, to take the mean to maximum fees and to exclude the minimum, and to add a particular premium. Urfirer sought to justify those choices — for instance, he testified that he took the top two quartiles based on the history of Stone Key's relationship with Monster and that he added a co-advisor premium of 25-50% based on investment-banking experience (Tr. 114-16; 119-20) — but the fact remains that they were anything but objective ones. Moreover, Section 4(d) calls for a fee consistent with transactions of "similar size and complexity where there are two co-financial advisors," (Engagement Letter § 4(d)), but the fee run performed by Stone Key did not even distinguish between single-advisor and co-advisor fees, and it is impossible to tell how complex each transaction in the fee run was, never mind what the relationship between the banker and client was or how much work the banker had performed on the deal. (*See* Tr. 90; PX-113, at 13).

On top of that, at best, a "fee run" yields only a range of fees, and fixing on a "mutually acceptable" fee within that range would plainly have required further negotiation and agreement. Stowell testified, for example, that the final fee would have been "negotiated based on [the] complexity or amount of time and energy [the bank] put[s] into a transaction." (Tr. 351). And McVeigh concurred, explaining that whether and where to fix a fee within the fee-run range would have been "a function of [a] business negotiation" between the bank and company. (Tr. 433). Given all of that, it is not surprising that Urfirer himself characterized the Partial Sale Transaction fee provision in deposition testimony as an "agreement to agree" (albeit perhaps without understanding the legal implications of that characterization), (*see* Tr. 95-96), or that

Hubbard used the same words in an e-mail to Monster regarding a draft of the Engagement Letter. (DX-126, at 1 ("The attached Engagement Letter and Retainer Amendment have been updated to reflect the 'agreement to agree' on a fee for all transactions other than a sale of the entire company.")). Nor is it surprising that Stone Key's own calculation of the fees it is owed for the JobKorea transactions morphed dramatically between its initial demand and its final litigation position. (Tr. 99, 101-08; DX-117; Urfirer Aff. ¶¶ 130-43). Urfirer and Hubbard may not have been using the term "agreement to agree" in a legal sense, but their characterizations were nonetheless apt. Put simply, "it is evident that the parties expected to negotiate an additional fee arrangement at a later date and declined to define [Stone Key's] complete compensation package at the time of contracting. . . . The compensation clause therefore is indefinite and unenforceable as a formal contract, as a matter of law." *Benevento*, 1993 WL 126424, at *7-8; *accord GEM Advisors*, 667 F. Supp. 2d at 326.[9]

Cowen & Co., LLC v. Fiserv, Inc.*, 31 N.Y.S. 3d 494 (N.Y. App. Div. 2016), upon which Stone Key principally relies (Docket No. 72-2), does not call for a different result. In *Cowen*, the First Department held that a transaction fee was not an unenforceable agreement to agree where it required the parties to "work in good faith" toward a fee that was "consistent with investment banking industry practice for transactions of comparable complexity, level of analysis and size." *Cowen*, 31 N.Y.S. 3d at 495-96. The Court found that the fee was sufficiently definite because it could "be ascertained from public price indices and industry practice." *Id.* at 496. In *Cowen*,

---

[9] Stone Key might have had a claim for *quantum meruit*, *see Benevento*, 1993 WL 126424, at *5 ("[I]f the contract is unenforceable due to indefiniteness, the party seeking to enforce the compensation clause may be entitled to recover on a *quantum meruit* basis the reasonable value of services rendered."), but Stone Key explicitly dropped its *quantum meruit* claim before trial and thus has waived any such argument. (*See* Docket No. 83, at 2).

however, the parties had engaged in a pre-litigation course of conduct that signaled agreement over how to conduct a fee run and where they would have set the fee. *See id.* at 495, 497 (describing that the parties had discussed a 1% fee for the potential transaction and exchanged fee runs and that "[a]t no time did defendant object to plaintiff's approach"). By contrast, Monster and Stone Key never discussed a fee, let alone how to calculate a fee, for JobKorea I until Stone Key made its February 2017 demand. (DX-117; Yates Aff. ¶ 52). And, as discussed above, the record here is replete with evidence that conducting a fee run entails a host of subjective choices — and is not guided by "fixed and invariable" standards in the investment-banking industry. *Benevento*, 1993 WL 126424, at *7 (internal quotation marks omitted). In any event, even if *Cowen* were on point, it is not binding, *see, e.g.*, *C.I.R. v. Bosch's Estate*, 387 U.S. 456 (1967) ("[I]n diversity cases . . . while the decrees of lower state courts should be attributed some weight[,] the decision is not controlling where the highest court of the State has not spoken on the point." (internal quotation marks and alterations omitted)), and the Court would decline to rely on it, as the First Department gave no consideration to either the subjective choices that underlie a fee run or the negotiations required for parties to fix upon a fee even after completing the fee run.

In sum, although the completion of Stone Key's engagement does not, by itself, preclude its claim for fees relating to JobKorea I, that claim fails for at least two reasons: because the transaction did not qualify as a Partial Sale Transaction within the meaning of the Engagement Letter and because the relevant fee provision is an unenforceable agreement to agree.[10]

---

[10] In light of that conclusion, the Court need not and does not reach Monster's other arguments for rejection of Stone Key's claim relating to JobKorea I — namely, that JobKorea I did not qualify as a "Partial Sale Transaction" because it was not even a "Transaction" within the meaning of the Engagement Letter; that Stone Key waived any right to payment when it elected not to seek a fee for several years; that because Stone Key was not Monster's exclusive advisor

## C. Expenses

Stone Key's final claim is for reimbursement of its out-of-pocket expenses pursuant to Section 5 of the Engagement Letter, which provides that Monster will reimburse "all out-of-pocket expenses reasonably incurred, invoiced and documented . . . in connection with Stone Key's rendering its services under this Agreement." (Engagement Letter § 5). Wisely, Monster does not contest (and certainly does not seriously contest) that Stone Key is entitled to some such reimbursement. (Def.'s PCL Response ¶¶ 143-48). Instead, the only dispute is whether Stone Key is entitled to all $47,339.01 in expenses that it claims. The Court concludes that it is not for the simple reason that those expenses include some that predated the signing of the Engagement Letter on April 20, 2012, and some that postdated the completion of the engagement by August 1, 2013. (PX-111, at 2, PX-114). Admittedly, Stone Key's work on the strategic review began several weeks before the Engagement Letter was signed. (PX-22, at 2). Section 5, however, does not provide for reimbursement of expenses incurred before the Engagement Letter was signed. Instead, by its terms, it provides for reimbursement only of expenses reasonably incurred "under" the Engagement Letter — and, as Stone Key conceded during oral argument, the expenses incurred before the agreement was signed (or after it was completed) could not, by definition, have been incurred "under" the agreement. (*See* Tr. 479). Excluding those items, and mindful that Monster did not contest the reasonableness of Stone Key's alleged expenses, the Court finds that Monster owes Stone Key $37,267.50 for the out-of-pocket expenses Stone Key incurred under the Engagement Letter. (PX-114).

---

and Monster negotiated JobKorea I independently, the transaction is outside the ambit of the Engagement Letter; and that, because Stone Key was not the procuring cause of JobKorea I, it cannot seek compensation for the transaction. (Def.'s PCL ¶¶ 57-70).

Further, the Court concludes that Stone Key is owed prejudgment interest on those expenses from the date of Stone Key's original invoice — namely, February 13, 2017. "Under CPLR 5001, interest on a sum awarded as a result of a breach of contract is computed from the earliest date that the claim accrued." *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 486 (N.Y. 2011). "In contract actions, . . . a claim generally accrues at the time of the breach." *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 967 N.E.2d 1187, 1191 (N.Y. 2012); *see also Reid v. Inc. Vill. of Floral Park*, 967 N.Y.S.2d 135, 136 (N.Y. App. Div. 2013) ("Where the claim is for the payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the plaintiff possesses a legal right to demand payment."). "[W]hen the right to final payment is subject to a condition, the obligation to pay arises and the cause of action accrues, only when the condition has been fulfilled." *Hahn Auto. Warehouse, Inc.*, 967 N.E.2d at 1191 (quoting *John J. Kassner & Co. v. City of N.Y.*, 46 N.Y.2d 544, 550 (1979)). Under the Engagement Letter, Monster's obligation to reimburse Stone Key for its out-of-pocket expenses was conditioned only on Stone Key's "request" for payment of those expenses. (*See* Engagement Letter § 5). Stone Key's claim for reimbursement of its expenses thus accrued on the day it rendered a request for reimbursement — that is, on February 13, 2017, the date of its first invoice. Stone Key is therefore entitled to 9% interest on its out-of-pocket expenses as of that date. *See, e.g.*, *Harbinger F&G, LLC v. OM Grp. (UK) Ltd.*, No. 12-CV-5315 (CRK), 2015 WL 1334039, at *35 (S.D.N.Y. Mar. 18, 2015) (applying New York law to conclude that the plaintiff's breach-of-contract claim "accrued . . . when it sent [the defendant] the final written demand for payment").

## CONCLUSION

For the reasons stated above, the Court concludes that Stone Key failed to carry its burden to show that Monster breached the terms of the Engagement Letter by refusing to pay Stone Key fees in connection with JobKorea I, JobKorea II, or the Randstad Transaction. In particular, the Court holds, first, that Stone Key's engagement had ended by August 1, 2013, thereby precluding any claim for fees arising out of JobKorea II or the Randstad Transaction; and second, that Stone Key is not entitled to a fee for JobKorea I, even though the transaction occurred during the tail period, because the transaction did not qualify as a "Partial Sale Transaction" and because the fee provision is an unenforceable agreement to agree. Accordingly, Monster is entitled to judgment on Stone Key's first three claims. By contrast, with respect to its fourth claim, Stone Key did prove that it is entitled to $37,267.50 for its out-of-pocket expenses, plus 9% prejudgment interest as of February 13, 2017.

The parties shall confer and, **no later than two weeks from the date of this Opinion and Order,** file an agreed-upon proposed judgment consistent with this Opinion and Order.

The Clerk of Court is directed to terminate 17-CV-3851, Docket Nos. 55 and 61.

SO ORDERED.

Date:  August 10, 2018  
       New York, New York

_____  
JESSE M. FURMAN  
United States District Judge